UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.              Case No. 18-CR-177

RUSSELL SPALDING,

    Defendant.

## PLEA AGREEMENT

  1.  The United States of America, by its attorneys, Matthew D. Krueger, United States Attorney for the Eastern District of Wisconsin, and Benjamin W. Proctor, Assistant United States Attorney, and the defendant, Russell Spalding, individually and by attorney John Campion, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### **CHARGES**

  2.  The defendant has been charged in a three-count indictment, which alleges violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(E), 846, and 856, and Title 18, United States Code, Section 2.

  3.  The defendant has read and fully understands the charges contained in the indictment. He fully understands the nature and elements of the crimes with which he has been charged, and the charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4. The defendant voluntarily agrees to plead guilty to the following counts set forth in full as follows:

## COUNT ONE
**THE GRAND JURY CHARGES:**

From on or about October 1, 2014, and continuing through October 8, 2015, in the State and Eastern District of Wisconsin,

**RUSSELL SPALDING and
KATHRYN SPALDING, a/k/a KATHRYN BUSS,**

knowingly and intentionally conspired with each other, and with other persons known and unknown to the Grand Jury, to distribute a mixture and substance containing anabolic steroids, a Schedule III controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(E).

All in violation of Title 21, United States Code, Section 846.

## COUNT TWO
**THE GRAND JURY FURTHER CHARGES:**

On or about October 8, 2015, in the State and Eastern District of Wisconsin,

**RUSSELL SPALDING and
KATHRYN SPALDING, a/k/a KATHRYN BUSS,**

knowingly and intentionally possessed with intent to distribute a mixture and substance containing anabolic steroids, a Schedule III controlled substance.

All in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(E); and Title 18, United States Code, Section 2.

## COUNT THREE
**THE GRAND JURY FURTHER CHARGES:**

From on or about March 5, 2015, and continuing through on or about October 8, 2015, in the State and Eastern District of Wisconsin,

**RUSSELL SPALDING and
KATHRYN SPALDING, a/k/a KATHRYN BUSS,**

knowingly and unlawfully used and maintained a place located at 1112 South Wells Street, Apartment #1, Lake Geneva, Wisconsin, for the purpose of manufacturing and distributing anabolic steroids, a Schedule III controlled substance.

All in violation of Title 21, United States Code, Section 856(a)(1); and Title 18, United States Code, Section 2.

5. The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offenses described in paragraph 4. The parties acknowledge and

understand that if this case were to proceed to trial, the government would be able to prove the following facts beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt:

      Russell Spalding led an anabolic steroid manufacturing and distribution organization from approximately October 2014 through October 8, 2015. He called his business "Cerastes Pharmaceuticals." He imported raw and processed anabolic steroids from the United Kingdom and China, and distributed the steroids to others around the United States using Facebook groups and the U.S. Postal Service. He had several people help him import, manufacture, sell, and ship the steroids. This included his wife Kathryn Spalding a/k/a Kathryn Buss, who helped in all aspects of the operation; E.O. and S.K. who worked in Spalding's laboratory and accepted packages of steroids for Spalding; L.S., whose Stamps.com account Spalding used to ship packages of processed steroids to customers; A.L.T., who shipped steroids from the United Kingdom to Spalding in Wisconsin; J.G.C., R.C., and B.B. who distributed Spalding's steroids to others; and M.S. and C.T. who accepted packages of steroids for Spalding. The information herein is based on witness statements, physical and electronic surveillance by law enforcement agents, information obtained through search warrants and public records, laboratory testing, and other reliable means.

      In May 2015, DEA agents received information from a confidential source (CS-1) that Russell Spalding was manufacturing and distributing anabolic steroids. CS-1 provided details of how Spalding was importing, manufacturing, selling, and shipping the steroids. In October 2015, DEA agents spoke to another confidential source (CS-2) who confirmed that Spalding was operating a steroid distribution network, and provided details about how Spalding was making and selling the steroids.

      As part of the investigation into Spalding, DEA discovered that in January 2014, U.S. Customs and Border Patrol (CBP) in Racine intercepted a package shipped from the United Kingdom to Wisconsin labeled as "lipstick samples." It was addressed to E.O. in Elkhorn, Wisconsin. CPB opened the package and found it contained 100 vials of a powdery substance listed as HGH. Other packages were also intercepted by CBP, including one on July 29, 2014, from the United Kingdom to Kathryn Spalding that CBP discovered contained 13 vials of "boldenone undecylonate" (anabolic steroids) and 1500 tablets of astralean clenbuterol (non-steroid prescription substance).

3

In July 2015, DEA agents conducted surveillance of Spalding and they observed Spalding travel several times to and from 1112 S. Wells Street, Apartment #1, Lake Geneva, WI, which was not his residence. Agents suspected (and later confirmed) that this apartment was being used as Spalding's steroid-manufacturing laboratory. On August 11, 2015, DEA received records showing the apartment was rented to Kathryn Spalding on March 3, 2015.

On August 10, 2015, DEA agents met with the Lake Geneva Post Master who stated that Russell Spalding and Kathryn Spalding had been dropping off large numbers of packages on a regular basis. Agents reviewed several packages that had recently been dropped off and recognized the names of several individuals as Spalding's steroid customers based on conversations from Spalding's Facebook account, which they had been monitoring.

To ship the packages, Spalding used the name, return address, and Stamps.com account of his friend L.S. in Lake Geneva, Wisconsin. Records show that between February 2015 and October 2015, L.S.'s Stamps.com account shipped approximately 3,100 packages through U.S. Postal Service (USPS).

On August 12, 2015, USPS agents in Wisconsin obtained a search warrant for a package addressed to B.N. in Lincoln, Nebraska, from L.G. in Lake Geneva, WI. Spalding had previously shipped several packages to B.M. using the L.S. Stamps.com account. Upon opening the package, USPS agents found 3 vials of liquid anabolic steroids, 1 bottle of Cialis capsules, and 1 bottle of Anastrozole capsules. The bottles were labeled as products of "Cerastes Pharmaceuticals." The Wisconsin Crime Lab confirmed that the vials contained anabolic steroids.

On August 13, 2015, USPS Postal Inspectors interviewed the Lake Geneva postal employees who were present when Spalding's packages were delivered. The employees confirmed that Kathryn Spalding always dropped off the packages, and had been doing so for approximately 2 years.

Starting in July 2015, agents served several search warrants on Facebook for various accounts used by Spalding to distribute steroids. These included accounts "Russell.Spalding.5," "Alicia Hunt," and "Penelope Hunt" (which Spalding shared with Kathryn Spalding).

4

In the "Russell.Spalding.5" account, agents found hundreds of pages of messages between Spalding and others regarding obtaining steroids, manufacturing steroids, selling steroids, and related matters. For instance, there are several hundred messages between Russell and A.L.T. who was Spalding's steroid supplier from the United Kingdom. In these messages, Spalding and A.L.T. discuss orders for steroid products, prices, and payments, shipping addresses, shipping confirmation numbers, and manufacturing steroids at home. In one chat, they discuss the need for A.L.T. to ship the steroids to several addresses in order to avoid suspicion by law enforcement. In another chat, Spalding brags about making $15,000 per month selling steroids. In other chats, A.L.T. and Spalding discuss Spalding setting up his own laboratory and the importance of hiding the activity from law enforcement. Spalding talks about being careful, and that the risk of being discovered by law enforcement is worth it because he was making so much money. Agents also found several messages between Spalding and his friends and relatives in which Spalding coordinates with them about receiving packages (of steroids) for him from overseas, and that he will pay them for each package they receive.

The "Alicia Hunt" account was used by Spalding to advertise and sell steroids to his several hundred "friends." The account included several postings regarding sales and shipments of steroids. The account also had several private messages between Spalding and others regarding steroids. For instance, in a series of messages with R.C. in November 2014, R.C. and Spalding agree to exchange a Kimber 1911 firearm and ammunition for $1250 worth of steroids. R.C. then placed an order with Spalding for $1,248 worth of steroids (several specific types and amounts), and Spalding directed R.C. to ship the firearm to "Kathy Buss, XXXX Oak Road, Lake Geneva, Wisconsin" (which was Spalding and Kathryn Spalding's home address). On November 14, 2014, R.C. sent Spalding a photo of the mailing envelope and a tracking number.

In the "Penelope Hunt" account, which was used by Spalding and Kathryn Buss, agents found several postings advertising the sale of steroids, price lists, shipping details, and delays in shipping. There were also several messages between "Penelope" and others in which Kathryn Spalding discusses sales and shipments of steroids.

On October 8, 2015, agents executed a search warrant at Spalding's residence in Lake Geneva. At the residence, agents found a firearm, ammunition, drug paraphernalia, steroids, price lists, steroid-manufacturing recipes, steroid order lists, customer shipment lists, and other documents relating to the manufacture and sales of

5

anabolic steroids. In Spalding's truck outside the residence, agents found three rifles. Spalding, who was a felon at the time, was taken into custody.

Also on October 8, 2015, agents executed a search warrant at Spalding's steroid laboratory at 1112 S. Wells St. Apt. #1, Lake Geneva, Wisconsin. Inside the apartment, agents found thousands of vials (empty and full), vial caps, labels, beakers, containers of liquids, capsules (empty and full), graduated cylinders, bags with Chinese lettering containing powders (some of which were raw steroids from China), needles, syringes, liquid filling machines, measuring pumps, paperwork indicating internet orders, gloves, surgical masks, bubble wrap and bubble envelopes, documents with recipes, and other items for manufacturing and selling large amounts of anabolic steroids and other materials. In all, agents recovered more than 12,000 capsules containing anabolic steroids, approximately 8,000 milliliters of liquid containing anabolic steroids, and several kilograms of various powders, including at least 3 kilograms of powder that the DEA crime laboratory confirmed containing anabolic steroids. Agents also seized $16,602.31 from Spalding, which Spalding later admitted were proceeds from distributing steroids.

Following his arrest on October 8, 2015, Spalding agreed to speak with agents, Spalding admitted that between February 2014 and October 2014, he was obtaining anabolic steroids from the United Kingdom and then reselling them at double price to between 150 and 200 customers. Spalding stated that between October 2014 and March 2015, he was manufacturing his own steroids in his home, and in March 2015, he moved his lab to a new apartment at 1112 S. Wells Street. Spalding stated that he stored kilograms of raw steroid powder there, as well as finished products. Spalding explained how he made up batches of steroids and that he paid several people to help him make and distribute the steroids. Spalding stated that he sold his steroids through Facebook groups, which had about 400 members. Spalding stated that on average he was obtaining 6 to 10 kilograms of raw powder per month from sources in China. Spalding said he had several people reselling his products at various locations around the United States. Spalding admitted that for one transaction, R.C., who lives in California, traded a .45 caliber Kimber handgun to Spalding for steroids.

Several other individuals connected to Spalding's steroid trafficking operation were questioned by law enforcement. These witnesses stated that Spalding imported large amounts of steroids from China, and that he, along with others whom he paid,

6

manufactured steroids in an apartment in Lake Geneva. They confirmed that Spalding sold the steroids through Facebook groups.

This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, the offenses.

## PENALTIES

6. The parties understand and agree that the offenses to which the defendant will enter a plea of guilty carry the following maximum terms of imprisonment and fines:

- Count One: up to 10 years imprisonment, up to $500,000 in fines, a minimum of 2 years and a maximum of life on supervised release, and a $100 special assessment.

- Count Two: up to 10 years imprisonment, up to $500,000 in fines, a minimum of 2 years and a maximum of life on supervised release, and a $100 special assessment.

- Count Three: up to 20 years imprisonment, up to $1,000,000 in fines, a minimum of 3 years and a maximum of life on supervised release, and a $100 special assessment.

7. The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney, including any possibility that the defendant may qualify as a career offender under the sentencing guidelines.

## ELEMENTS

8. The parties understand and agree that in order to sustain the charge of conspiracy to distribute a controlled substance (anabolic steroids) as charged in

7

Count One, the United States must prove the following elements beyond a reasonable doubt:

1. First, that the conspiracy as charged in Count One existed, and
2. Second, that the defendant knowingly became a member of the conspiracy with an intention to further the conspiracy.

The parties understand and agree that in order to sustain the charge of possession with intent to distribute a controlled substance (anabolic steroids) as charged in Count Two, the United States must prove the following elements beyond a reasonable doubt:

1. First, the defendant knowingly possessed a controlled substance;
2. Second, the defendant intended to distribute the substance to another person; and
3. Third, the defendant knew the substance was a controlled substance.

The parties understand and agree that in order to sustain the charge of maintaining a drug-involved premises as charged in Count Three, the United States must prove the following elements beyond a reasonable doubt:

1. First, the defendant knowingly leased, rented, used, or maintained a place; and
2. Second, the defendant did so for the purpose of manufacturing, distributing, or using a controlled substance. The government is not required to prove that was the defendant's sole purpose.

## SENTENCING PROVISIONS

9. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be

8

disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

10. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

11. The parties acknowledge and agree that they have discussed the sentencing guidelines provisions which they believe to be applicable to the offenses set forth in paragraph 4. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

12. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

### Sentencing Guidelines Calculations

13. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to

9

be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

### Relevant Conduct

14. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual (U.S.S.G.) § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which the defendant is pleading guilty.

### Base Offense Level

15. The parties agree to recommend to the sentencing court that the applicable base offense level for the offenses charged in Counts One, Two, and Three is 20 under U.S.S.G. §§ 2D1.1(a)(5) and 2D1.1(c)(10)

### Specific Offense Characteristics

16. The parties agree to recommend to the sentencing court that the following adjustments are applicable to the offenses charges in Counts One, Two, and Three: a 2-level increase for possession of a weapon under U.S.S.G. § 2D1.1(b)(1); a 2-level increase for distribution over a computer under U.S.S.G. § 2D1.1(b)(7); a 2-level increase for maintaining a premises for manufacturing a controlled substance under U.S.S.G. § 2D1.1(b)(12); a 2-level increase for importing a controlled substance under U.S.S.G. § 2D1.1(b)(15)(C).

10

## Role in the Offense

17. Pursuant to U.S.S.G. § 3B1.1 the parties acknowledge and understand that the government will recommend to the sentencing court that a 4-level increase be given for an aggravating role in the offense, as the defendant was an organizer and leader of criminal activity that involved 5 or more people and was otherwise extensive.

## Acceptance of Responsibility

18. The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Career Offender or Armed Career Criminal

19. The parties acknowledge, understand, and agree that the defendant may qualify as a career offender under the sentencing guidelines. The parties further understand, acknowledge, and agree that the defendant may not move to withdraw the guilty plea solely as a result of a determination that under the guidelines, the defendant is determined to be a career offender.

11

## Sentencing Recommendations

20. Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

21. Both parties reserve the right to make any recommendation regarding any and all factors pertinent to the determination of the sentencing guideline range; the fine to be imposed; the amount of restitution and the terms and condition of its payment; the length of supervised release and the terms and conditions of the release; the defendant's custodial status pending the sentencing; and any other matters not specifically addressed by this agreement.

22. The government agrees to recommend a sentence within the applicable sentencing guideline range, as determined by the court.

## Court's Determinations at Sentencing

23. The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the

sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

24. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

25. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

26. The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form.

### Special Assessment

27. The defendant agrees to pay the special assessment in the amount of $300 prior to or at the time of sentencing.

### DEFENDANT'S WAIVER OF RIGHTS

28. In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

   a. If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

   b. If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

   c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

   d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be

    entitled to compulsory process to call witnesses.

  e. At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

29.  The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

30.  The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

31.  The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

## GENERAL MATTERS

32. The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

33. The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

34. The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

35. The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

36. The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the

defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

37. The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 4/19/19

RUSSELL SPALDING
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 5/17/2019

JOHN CAMPION
Attorney for Defendant

For the United States of America:

Date: 5/17/19

MATTHEW D. KRUEGER
United States Attorney

Date: 5-17-19

BENJAMIN W. PROCTOR
Assistant United States Attorney

19